Court this morning. To my right is Judge Diaz. Judge Floyd is to my left. Judge Nguyen, who will hear the first case. That will be Richard Roe v. Department of Defense. Good morning, Your Honors. May it please the Court. I'm Louis Yellen from the Department of Justice, and I'm here today on behalf of the Department of Defense and the Air Force. I'd like to reserve five minutes of my time for rebuttal. Your Honors, the district court fundamentally erred in holding that it is irrational for the military to choose not to deploy HIV-positive service members to combat zones such as Iraq and Afghanistan. The court similarly erred in holding that the Air Force's discharge decisions were insistent with the applicable policies and that plaintiffs have established the irreparable injury necessary for an injunction. For these reasons, the court should vacate the preliminary injunction. I'd like to begin by addressing the deployment policy. There are safety risks and foreign policy harms that follow from deploying HIV-positive services. Is in this case the deployment policy, or is it the discharge? It's both, Your Honor. The discharge was premised on the plaintiff's inability to deploy to CENTCOM, and the district held that it was irrational to deploy, excuse me, to discharge plaintiffs because of their inability to deploy. The district court's decision unambiguously held that the deployment policy was irrational, and that is a key part of its discharge decision. When was the deployment? Excuse me just one second. Go ahead. What's the bottom line reason they couldn't be deployed? Your Honor, there are both foreign policy and safety risk concerns that motivated the CENTCOM deployment policy. Now you say that, but what is it? On the foreign policy side, Your Honor, our States within CENTCOM's area of responsibility prohibit HIV persons from entering their territory. If CENTCOM permitted HIV-positive service members to deploy to those areas, and if, as could well happen, it had to be disclosed that CENTCOM had done that, that would cause pretty serious foreign policy diplomatic harm between the United States and those States, because we would have violated those States' laws. On the safety risk side, there are two types of risk I'd like to discuss. First, the baseline civilian context. Thankfully, the risk of transmission of HIV is very low, but it's not nonexistent. And for that reason, the United States Public Health Service recommends that if anyone is exposed to HIV, they receive post-exposure prophylactic care. In light of the fact that even in the civilian context, post-exposure prophylactic care is necessary, it's not irrational for the military to decide that it does not want to have the requirement to ensure that every person who could conceivably be exposed to HIV in the combat context have prophylactic treatment. In addition, there is an imbalance between the likelihood of transmission, which is slow, and the significance of the harm if there is a transmission, which is very high. If there is a transmission, the person who becomes infected has a chronic, incurable, though manageable, disease, but a chronic and incurable disease. Has the — I take it the science on this and the medicine has changed over the years. That's right, Your Honor. Thankfully, it has. So to the extent that the individuals here are involved, it's interesting the physician's position, for the most part, seems to indicate they are treated to a level where you cannot detect it. Is that correct? That's correct, Your Honor. And they don't see any reason that they should not be in a deployable, be able to deploy? Your Honor, that's the opinion of nonmilitary personnel, of persons, nonmilitary doctors who don't have to take into account the rigors, the chaos of deployment in combat settings. But I'm only addressing at this point the science and the medicine. I just want to make sure. Because the policy at its inception, what informed the policy? Was it the science and the medicine on it, or was it just they just decided to? No, Your Honor. It was most definite — it was two things. It was the science in combination with the circumstances that the individuals would be in if they were deployed. I would point, Your Honor, to the 2014 and 2018 reports in which the Department of — reports to Congress in which the Department of Defense explained the science that the Department and its branches rely on in coming up with an HIV policy, and, in fact, which informed Congress. And what was the time period of that science that it relied on? The last report was 2018, and the reports indicate that the Department of Defense on an annual basis has its experts review the current science, and the Air Force on a biannual basis reviews the science, because the Department — What is the evidence that they actually waited, though, to review it, is one thing. But don't you have to do something with it? I mean, review it means you looked at it, and you could be favoring something different. Where's the evidence that they waited, considered it in light of what had been done? Your Honor, perhaps I wasn't clear enough. The reports say that the Department of Defense and the Air Force have to reconsider their policies in light of the most recent evidence. Your Honor— Your Honor, can I ask sort of just a fundamental background question? Because there seems to be a ticket of instructions and regulations here that, at times, seem to be working at cross-purposes or appear to be inconsistent. Let me just start with this DOD instruction 6490.09. Yes, Your Honor. It says that it categorizes infectious diseases as a category of diseases that may limit the deployability of certain service members, and it includes HIV, but it has a caveat that suggests that someone is not deployable unless they obtain a waiver, but only if they have progressive clinical illness or immunological deficiency, which suggests, and as best I can tell in this record, neither one of these two plaintiffs fit in that category. So how do we get from that to a situation where we've got two service members who are asymptomatic being evaluated for discharge and not even being considered for a waiver? Explain that to me. Everything that you described is accurate, Your Honor. 6490.07 on its face provides minimum standards, and on its face permits the different parts of the military to consider more restrictive standards if they're necessary. Where does it say that? I'm sorry. I don't have the Joint Appendix citation. I'll have it for you in my rebuttal. It's — I can assure the Court it's absolutely explicit that it provides only minimum standards. The CENTCOM, for reasons I'll address now, if the Court will allow me, has a more rigorous standard, and that is because its area deals with some very serious combat zones, and individuals could deploy to those combat zones. And there are risks in the military context, in the combat context, that simply don't exist in civilian life. Well, let me ask you about that. But it seems to me that even with respect to the possibility of waivers, to include waivers for people with HIV, but the record seems to suggest that there is an almost categorical bar to obtaining a waiver in that particular circumstance. So what's your position on that? Is there a bar, categorical bar in this case? So if I might, let me — I can't answer yes or no without some background, if I may. Dr. Crone's deposition in the record makes clear that he is the waiver authority for CENTCOM. He considers each particular waiver request on its face, and there is a calculation that he has to make between the particular circumstances of the case and the condition of the person whose commander is seeking a waiver and the benefit to CENTCOM. If the person has skills that others can perform, Dr. Crone has explained, that balance is not in favor of a waiver. If, however, there is someone who has specialized skills that are not easy to replace, I'm going to give a made-up hypothetical, someone who could diffuse a nuclear bomb, the waiver decision might be entirely different. Okay. Well, let me — let's apply that to this case. Where in this record is that kind of sort of detailed, specific analysis with respect to these two plaintiffs? There isn't, Your Honor, because there was not a waiver request made. And let me explain that, Your Honor. In making the discharge decision, the Personnel Commission that made the ultimate decision made an evaluation of the likelihood that a waiver would be granted in this context. Looking at three things, CENTCOM's general practice — Well, let me stop you there. So where in these regulations is that authorized, this kind of predictive, futuristic assessment, without actually looking at the individual characteristics of the servicemember? Your Honor, there's nothing in the regulation that — the regulations provide a standard, 1332.18 is the regulation. And the question is whether a servicemember can reasonably perform the duties that are assigned to that person. I understand that. And that seems to suggest that there would be an individualized assessment with respect to each of these plaintiffs. And there is an individualized assessment, Your Honor. Did you say there is or there isn't? There is. Okay. It is based on a predictive judgment about waiver. If it is the case that 80 percent of all deployments from the Air Force are to CENTCOM, and if it is the case that individuals with the — in the positions that these plaintiffs hold are incredibly unlikely to receive a waiver, as plaintiffs themselves concede — that's not in dispute here, Your Honor — so even if there were a waiver decision made, plaintiffs concede they would not — they're very unlikely to receive a waiver. There is nothing irrational or arbitrary or capricious about the Air — the Air Force making that predictive judgment. If I may turn to the military-specific risks, Your Honor, I think it's quite important  Before you go there — Yes, Your Honor. — you mentioned Dr. Crone's affidavit. It was offered in litigation. It was not part of the agency record. So to what extent should we consider that type of post hoc explanation? Your Honor, it's Hornbook APA law that any declaration submitted in the record for — which elaborate on the decisions that were made is permissible for the Court's consideration. To what extent? But is it permissible to say that's the reason they enacted certain regulations and policy? I think that — So that comes after it? Yes, Your Honor. Again — In fact, they had this information at the time? Or is that in the Hornbook? It is Hornbook, Your Honor, if it's explanatory of the decisions that were made and the policies — By the way, what Hornbook are you talking about? It is this circuit's precedent — Because you do realize the Hornbook is a treatise that is an opinion of someone. Your Honor, forgive me. If it's case law, I don't want your Hornbook. You're not in law school. I want case law and precedent from the Supreme Court, this Court, or some other court for guidance. But someone's opinion, as much as respected as they are, is not precedent in this court. Your Honor, I beg your pardon. It is Fourth Circuit and Supreme Court precedent. I don't have cases at hand. I would be happy to supply those to the Court. That Court may consider — Those are helpful to be able to give us cases. I will be very happy to do that, sir.  Now, if I may turn to the military-specific harms. Your Honors, small teams that are in combat could be grievously injured by an IED. In that circumstance, the teams have to provide emergency first aid to each other. Some people who are injured having to provide emergency first aid to other people who are injured. In that circumstance, it is much more likely that there is going to be blood-to- I'm sorry, Your Honor. I'm not familiar with — Dr. Crone has said that the treatment medications are highly specialized, which means that in order to be able to treat someone who has HIV, it makes it sound like it's really a big deal.   like it's really a big deal. There is a regimen of pills that can be taken. I don't believe that that Court is accurately describing the declaration as turning on the highly specialized — supposed highly specialized nature of HIV. Page 482, Dr. Crone says, And — Where in the record is that supported when the record shows one of these men only has taken one pill a day. Your Honor — And the other has taken two pills a day. Your Honor — What makes that highly specialized to the point that it must be constant diligence to be effective? It's highly specialized, Your Honor, in the sense that it is a medication that is not common that would have to be supplied in combat, in combat situations to each individual who needs to receive it, such that if the medication were destroyed or lost, it would have to be replaced. Logistics would have to be arranged for the replacement of that medication. It's not like an aspirin. It's — that's the sense in which — It's sort of like food. If you're out there and you don't supply food to people, they don't eat. They don't — they're not able to function. With respect, Your Honor, that is a common, consistent, everyday operation the military has to undertake. The question for this Court is, is it irrational for the military to choose not to undertake an additional burden of providing medication that would not — Your Honor, you are maintaining that taking one single pill is a highly specialized treatment. It's highly specialized, Your Honor, in the sense that it's not something that's commonly part of the kit, of the medication kit that's provided to all individuals in combat. Providing the logistics, if there are aspirin that are — Do people with high blood pressure prevent from going to? Your Honor, there is — Do they have to take a pill for their high blood pressure? Some of them are permitted, Your Honor. Categorically? No, Your Honor. There is a waiver — How about diabetes, categorically? No, Your Honor. There — people who are insulin-dependent, categorically, yes, Your Honor. People who are not insulin-dependent, not categorically. Your Honor — But someone who is — let's say they take a pill and they are asymptomatic for diabetes. But if they don't take it, they become diabetic. Your Honor, I need to stress, this is not least restrictive review. The under-inclusiveness or over-inclusiveness of a policy does not make it irrational. The question is, is there a legitimate basis, a reason that the military has for undertaking the policy that it did? And even if it's a question of providing additional logistics to ensure that medication is supplied and the military's decision is not to undertake that additional burden, that is not an irrational choice, Your Honor. It does not matter for purposes of rational basis review. Even if the military is inclined to take on that logistical burden for others suffering from different diseases? Yes, Your Honor. The military can reduce one risk under rational basis review without having to reduce other risks. And the reason for that is that there are other considerations brought to bear which make the circumstances different. High blood pressure, diabetes are not diseases that can be transmitted. They are not infectious diseases. They are not diseases that which could produce chronic lifelong diseases in an additional person. So it is the constellation of considerations that the military takes into account. And again, it does not have to be identical in all circumstances. Okay. Before you sit down, I think I understand your argument with respect to the constitutional claim. But I want to get back to this statutory claim and this issue of predictive ability to deploy. Is that something that the military has been engaged in from the get-go when it comes to HIV service members, or is this something recent? It is more recent. In 2016, the policy started to change. This traces back to a 2013 change in the Department of Defense regulations. In 2013, the Department of Defense modified 6485.01, which is the HIV policy. Previously, before 2013, under the 2006 version, the policy required referral only for HIV that was progressive. The policy in 2013 required referral for chronic or progressive. The Air Force, to bring its policies in compliance with that 2013 change, went through a process of ensuring that it referred individuals who are HIV positive if they have the chronic condition, even if it is not progressive. That is the reason for the change the SOPR declaration bears on this particular issue, Your Honor. So the change became more restrictive with the advancement of medical and science? It did, Your Honor, based on considerate — in which to treat HIV. You move from a position that they were allowed to one that they are not allowed? Your Honor, I'm over my time, and I'd like to ensure that I reserve some time for rebuttal. Would you like me to answer, Your Honor? Let's do that. Thank you, Your Honor. Your Honor, the question is not — the question is when to refer an individual for medical evaluation. This referral itself is not something that is the ultimate decision-making. This referral — other infectious diseases required referral for chronic or progressive manifestation. The change in the DOD policy brought the HIV policy in line with that, and the change in the Air Force policy brought the Air Force policy in line with the DOD policy. In light of that comment, how consistent is your policy with the other branches of the military? It's not in the record, Your Honor, but there is broad consistency. There are some differences based on some of the unique features of the other branches. The CENTCOM policy is — again, I want to stress this is not in the record. The CENTCOM policy is similar with other combat commands that have similar areas of responsibility, but it varies very much on the particular conditions of each military department and each combatant command. So you're saying somebody who might be on a submarine in a combat area may be okay, but an Air Force person, unlike the Marines and others, it's a different situation? Your Honor, we're well beyond the record. I could tell Your Honor that the Navy permits deployment, but only on massive ships that have full complements of medical facilities and where the logistics of providing for the appropriate medication is not an issue, but not in other situations. Again, we are well beyond the record here. This is not something that has been vetted yet in the district court. All right. You've got some time. We'll hear you, Your Honor. Thank you, Your Honors. Good morning, Your Honors. Before I get directly into the arguments that Government Counsel made just now, I want to make three kind of overarching points that I think help frame the way we think about this appeal. The first, and the Government didn't get into this at all, is that the only thing that's at issue here is a preliminary injunction entered on a limited record for the sole purpose and function of preserving the status quo to keep these airmen in the Air Force until their claims can be heard on the merits, something that I should point out would have happened already if the Government hadn't moved over our objection to stay at trial pending this appeal. The second point, Your Honor, is that the status quo that's being preserved by this preliminary injunction, keeping HIV-positive airmen in the Air Force to continue the careers that they've chosen and excelled in, was the Government's policy until about two years ago. For about 20 years, they didn't discharge people who had HIV routinely. That policy, as Counsel admitted, changed two years ago despite the advances in science that you would think were pointing the other way. And the third, Your Honor, and Judge Diaz got into this a little bit, is that there are two independent grounds for this preliminary injunction. The first is a straightforward regulatory claim that the discharges violated the Government's own regulations on HIV-best discharges. And the second is the claim that the categorical bar on prohibition, excuse me, the categorical bar on deployment by HIV-positive individuals is so far divorced from modern medical reality that it's irrational and can't be sustained. I'm going to talk first about the regulatory claim, Your Honor, because it's a straightforward, but I would, of course, like to get into the equal protection and arbitrary and capricious claims as well. Your Honors, the regulatory claim is actually quite straightforward. The applicable regulation is Air Force Instruction 44178, Section 2.4.1, which says unequivocally that HIV seropositivity alone is not a basis for discharging active-duty airmen. It's undisputed that these plaintiffs were in fact discharged because they have HIV. There's no dispute about that. The Government's only argument to the contrary is that, well, they were also discharged for another reason, which is that they're not deployable. But, Your Honors, that's pretty clearly wrong for a couple of reasons, one simply logical and one based on the regulation itself. Logically, the restriction on deployment is itself entirely based on HIV. So, logistically, if you're discharged solely because you're non-deployable and you're non-deployable solely because you have HIV, then you've been discharged solely because you have HIV. That's a logical statement. If A, then B. If B, then C is identical logically to if A, then C. I don't see how they get around that problem. Your Honors, the second reason is that the regulation itself, if you look at it, 2.4.1 says you can't discharge people because they have HIV. 2.4.2 says, by the way, HIV-positive people are undeployable. So the regulation itself contemplates non-deployability in the same text that it prohibits their discharge. So you can't read 2.4.1 to permit deployment-based discharges with a deployment bar. What did you say the second component of that Air Force instruction said with respect to this? 2.4.2, Your Honors, says that immediately after saying that HIV positivity is not a basis for discharge, 2.4.2 says HIV-positive people can't be deployed. So that is to say the regulation that bars HIV-based discharge contemplates that they can't be deployed. So if you read 2.4.1 to permit deployment-based discharges that are based on HIV, then you've really read it out of existence because, by definition, they're not deployable. And if on the government's reading, then by definition they're dischargeable. It makes 2.4.1's prohibition on discharge meaningless. If Your Honors don't have questions about that feature of the argument, I'll move on to the arbitrary and capricious claim, which is where ---- How do you factor in the CENTCOM restriction that seems to go a bit further than the Air Force regulations? So, Your Honor, the ---- unpack that a bit for me, Your Honor. I'm not sure I understand the question. Well, I'm trying to figure out what I'm trying to understand here is exactly the nature of your claim. Is it that ---- I understand the constitutional claim, but with respect to the regulatory claim, is it that as a matter of law these service members should never have been subject to discharge, or if they were going to be discharged, they were entitled to have someone determine whether or not they should receive a waiver? Which one is it? Well, Your Honor, the underlying claim is that they should never have been discharged, that the discharge facially violates 2.4.1 of AFI 44178. Now, the district court did say that the need for individualized determinations is an important part of this. And on the deployment, we need to separate, Your Honor, the discharge from the deployment. The discharge claim ---- excuse me, the deployment claim ultimately leads to the discharge claim. The discharge regulatory claim is independent of the deployment claim. So the point of what the district court said was ---- I'm not sure I understand that. I mean, if your clients can't be deployed, why wouldn't it rationally lead to the fact that they should be discharged? Well, because the regulation says they can't be, Your Honor, and the regulation understands that they can't be deployed. So it doesn't make sense to read that regulation to permit deployment-based discharges. Well, is it true that approximately 20 percent of these people can be retained because they're in low-deployment areas? So what the government said in a kind of post-facto analysis when they went back and looked at who had been discharged and who hadn't, they discovered that the people who had been discharged, by and large, had a deployment tempo rate of 20 percent or higher, and the people who were not discharged had a deployment rate of, I think it was, 17 percent or lower. There's no regulation or anything written anywhere that says that that's what the standard is, but they looked back at it and said that that's what the standard was. So it is true they do not discharge everyone who has HIV because they have HIV, but they do discharge some people, including these plaintiffs, because they have HIV. And that's why it's a violation of that regulation, which is in turn a violation of the Administrative Procedure Act. So your challenge here is both to the policies of Central Command on deployment as well as the discharge? Correct, Your Honor. The discharge claim stands on its own. There is a separate claim that the deployment policy is a violation of the APA and the Equal Protection Clause. You don't have to reach that to reach the violation of regulations claim. You could get there via either route. Either one is sufficient to sustain the injunction below. Who's flying this plane, the Department of Defense or the Air Force? Well, Your Honor, as Government Counsel explained and as Judge Diaz, I think, asked, there is a complicated thicket of regulations that govern these things. The governing Department of Defense regulation seems to be more permissible in terms of deployment of HIV-positive individuals in that they're deployable under DOD regs unless their illness is progressive or if they are not immune-suppressed. The Air Force's regulation is more restrictive, and the Central Command regulations are also more restrictive. And do you have any position on whether or not that's appropriate? Your colleagues seem to suggest that that's entirely consistent with the thicket of regulations that the Air Force was entitled to impose more restrictions. Your Honor, we have not challenged that aspect of the case. Okay. All right. So with respect to the equal – So let me make sure I think I understand what you just said a few moments ago. But your claim is twofold. One, simply because of your client's HIV status, that should not subject them to limitations on deployment. But even if that's correct, the fact that they're non-deployable simply because of their HIV status should not lead to their discharge. That's correct, Your Honor. And that's based on that Air Force regulation? That is based on an Air Force regulation. If that regulation didn't exist, this might be a different argument, but it does. And they followed it for 20-odd years by not discharging these people, and then they started doing it. Is that in the record? Yes. In fact, one of their witnesses said as much. So Central Command is responsible for this Modification 13 policy here. What authority, tell me again, does the Air Force have to challenge it or to deploy HIV-positive service members to the Central Command areas without a wait? My understanding, Your Honor, is that Central Command or any other military command regulations take precedence over service regulations in terms of who can and cannot deploy to those areas. I think the Air Force has to abide by Central Command's regulations. And the waiver authority for deployment to Central Command is at the Central Command level. The head surgeon of Central Command is the ultimate waiver authority for that. But, of course, remember, these airmen were never asked to deploy. As Judge Diaz pointed out, the Air Force made a predictive judgment that they wouldn't be allowed to deploy, which they made because the people at CENTCOM said, We don't give waivers to people with HIV. We've never given one, and we're highly unlikely to give one, which is why the district court found, quite unequivocally, that the prohibition on deployment by HIV-positive individuals is categorical, which was a significant part of her reasoning in granting the injunction. On the Air Force's instruction 44-178, do we owe the Air Force any level of deference in enacting that instruction? You do, Your Honor. I think all the cases say, and the district court, I think, went to some length to acknowledge the need for deference in the context of reviewing military regulations and military actions for separation of powers reasons. However, she found correctly that, in this case, the basis for these restrictive policies is so irrational that it survives even a highly deferential review. And it is clear, Your Honor, that whatever degree of deference is required, rational basis review won't suffer irrationality. That is to say, no matter how much deference you owe the military, if there's really not a rational basis for the policy, it has to fall. And that's where the district court found. Again, and that's a predictive judgment. This is a likelihood of success determination at this point. We haven't tried the merits yet. But based on the review that the record that she had, the district judge looked at it carefully, looked at what the government put forward in defense of its policies and said, you haven't given me a rational basis for upholding this policy. Based on the record that she had at that time, the only record that's currently in play, she couldn't identify a rational basis. So she found that we had a likelihood of success on that claim. What damage does, if any, does the fact that they get honorable discharges have to your irreparable harm argument? I don't believe it has any, Your Honor. There are certainly cases that say that honorable discharge of itself is not an irreparable harm. The irreparable harm claim here is a little narrower because this is a preliminary injunction. The purpose of this injunction is just to ensure that the district court can retain the ability to provide an adequate remedy on the merits. Because the government has argued that after the plaintiffs were ‑‑ so if the injunction, if the preliminary injunction goes away, the Air Force is going to discharge these men. And the government takes the position that once they are discharged, the courts can't reinstate them. The courts don't have the power to effect the remedy that they would seek. And, therefore, the preliminary injunction here serves the function of preserving the district court's power to effect the remedy that the plaintiffs seek. That is an absolute baseline proposition for preliminary injunctive relief. So I don't think it matters for this purpose, Your Honor. I think the district court, of course, also found that there's another basis for the injunction here, which is that the combination of the discharge together with a finding by the government of the United States that HIV makes one unfit for national service creates a particularly traumatic kind of stigma that will go with these men for the rest of their lives. And she found that that was a sufficient basis for the irreparable harm finding as well. Can I go back to your position on this constitutional claim? I don't think you dispute that the government has a strong, if not compelling, interest to protect the health and safety of their service members. Of course, Your Honor. Right. And recognizing that HIV treatment has undergone an astounding advance over the past 10, 15, 20 years so that all of what you say in the record is true about it being able to be controlled with proper medication, but the fact remains that in a combat environment there are uncertainties that abound, not unique to HIV but other diseases as well. And as your colleague pointed out, there is a risk, I suppose. Their point is that there is some risk and that particularly given rational review, that the military is entitled to make a judgment as to the level of risk that they are willing to accept in that unique combat environment. You may disagree with that. You may think that it's, you know, that the record suggests the evidence to the contrary. But what about that makes that irrational? Your Honor, let me put it this way. The government's position seems to be that any risk greater than zero justifies any restrictions that they wish to impose or at least justifies these restrictions. That can't be the right answer. You know, as the Supreme Court pointed out in a somewhat related context in Bragdon, there's nothing in life that doesn't have risk. Risk exists on a spectrum. You know, there's a non-zero risk that an asteroid will hit this courthouse today. It wouldn't be rational for me to plan my day around that possibility. Right? So the question isn't is there any risk? The question is what is the risk? And is it rationally related to the purpose for which the government has enacted these policies? And the district court looked at that question and said these risks are, and I think, I mean, frankly, the district court I think was surprised, as many people seem to be, at what these risks actually are. But when she looked at them. By the way, I want you to finish, but I highlighted just one factor. Obviously, the government had others, the issue with respect to medication, the ability to secure medication, the ability, the issue of transfusions and the like. I mean, it just wasn't one thing. It was this collective constellation of risks that, in their judgment, they found to be intolerable. And, again, we might disagree with respect to that judgment, but I'm just having trouble understanding why that is completely irrational. Well, you've got to break the risks down, Your Honor, to understand whether. Well, do we? I mean, don't we take them collectively ultimately? I mean, ultimately, I think you do have to take them collectively. But if the individual pieces add up to something like zero, then the policy is irrational. And that is essentially what the district court found here. I mean, so there's a couple of different risks, as you point out, that they identify. One is kind of transmission. There's really no dispute that sexual transmission is not a risk. If you are in treatment, the chances of transmitting HIV sexually, the record here says effectively zero. Since this happened, the CDC came back and said it's literally zero. It can't happen. So that's off the table. The risks they're talking about are essentially kind of combat care, wound risks, you know, wound-to-wound contact, blood splash, things like that. So there's evidence in the record on what the risks of those things are. And what that record evidence shows, Your Honor, is that the risk is merely theoretical at best. The military has studied these things. They did a study of HIV transmission in the Afghanistan theater from 2001 to 2007. This is in the record. They identified, and keep in mind, that's a study of people who by definition are not in treatment, right, because people who have HIV and are in treatment in the military can't deploy. So if you're deployed, that means you're not in treatment, which means you are as infectious as you can be, right? So in this study, what they found was that 1.3 million servicemen deployed to Afghanistan from 2001 to 2007. They identified exactly 48 cases of HIV seropositivity of people who didn't have it when they went and had it when they came back. Zero of those cases involved transmission other than sexual transmission. Zero. And only one of those cases actually even happened during the deployment. One. One out of 1.3 million in an untreated population. So the government's own evidence tells you that the odds of transmission, even in the riskiest possible scenario, which would not happen with treated individuals like the plaintiffs here, the chances of transmission in a combat scenario are less than 1 in 1.3 million. That can't possibly be a rational basis for a policy that disfavors an entire group of people like this. Your Honor. So that's. Let me ask you a question in terms of the treatment, this antiviral treatment. It's administered over a period of time and the levels of the presence of the virus is detected at various times to the point, as I understand it, where the science is gone, it becomes undetected. And then the number of times that they are tested moves from quarterly to maybe semi-annual basis, that sort of thing. When a person is found to be at that undetectable level, how long does that period typically exist? So is there medical science that indicates that? In other words, a person is found today to be undetectable. If, for instance, they were to stop taking the medication, how long would it be before it would be detected? Your Honor, the answer is that it's not. It's sort of unique to the individual, but broadly it's four to six weeks to slightly more than that. And, again, once you get from undetectable to detectable, the transmission risk is still very, very low. Transmission risk doesn't reach its sort of apogee until you've been untreated for a very long time, like a year plus. And, again, as that study kind of goes back to show, one of the real misapprehensions about HIV in this context is that even when it's not in treatment, HIV is actually a pretty hard virus to transmit. The very riskiest sexual behavior in untreated individuals has an incidence of transmission of 1.3 percent, about 1 percent. If you're on treatment, it's some magnitudes below that. You know, the CDC now says it's effectively zero. So, you know, these regulations were adopted in a time when people were terrified of this virus, right? They were adopted at a time when people viewed this as a highly transmissible death sentence. It hasn't been that for a very long time. And the Army's, excuse me, the military's regulations are going in the wrong direction on this. They're no longer justified by the science that originally justified them. With respect to this, the question of deployability and waivers, is it your position that, well, first of all, I understand you to say that simply based on HIV status alone, there should be no cause for limiting deployability. But let's assume we're passing to the question of waiver. Is it your argument that this kind of predictive analysis without actually looking into particulars of an individual service member and deciding whether or not that particular service member might, in fact, be deployable, whether that violates the APA? It is our position, Your Honor, because what the regulations contemplate is, as you say, an individualized determination. And the question isn't just do you have HIV. It's where exactly are you deploying to? What are the medical facilities that are available there? What are the conditions on the ground? You know, there's a variety of things that they are supposed to take into consideration when they make these determinations. And, A, it's not clear that CENTCOM makes them anyway. But here CENTCOM didn't even get the chance because, as you point out, the Air Force made a predictive judgment about how that would go. We're sort of twice removed from any possible individualized determination. I mean, to use the example that Mr. Yellen used, you know, if one of our clients, you know, had a specialty that was, you know, disarming nuclear weapons or something like that, he would be out of the Air Force. They wouldn't look into that. They would say if you look at his discharge sheet, the box where it says reason for discharge, it says HIV in big letters. That's what it says. They didn't ask whether he could do anything important. I understood him to say that that, in fact, is a relevant factor in deciding whether or not to discharge somebody. Oh, he said it would be. But there's no evidence that they considered anything like that in these cases. If you look at the letters that the people got in this question, there's six of them in evidence. They're almost identical. I mean, down to the phrasing. And a lot of them came out on the same day. There's just no evidence that they gave any degree of individualized consideration here. Thank you, Mr. Eden. Thank you. Mr. Yellen, you have a brief rebuttal. Thank you, Your Honors. I have three points in rebuttal that I'd like to make. But first, Your Honor, the citation I promised you. Joint Appendix 137 indicates that 6490.07 only creates minimum standards. The three points I'd like to make are this. First, even if the Court has any question about the likelihood of success on the merits, plaintiffs in no way engaged our demonstration in our reply brief that if plaintiffs ultimately prevail on the merits, they would be placed back in the identical position they were in before they were deployed. That simply means that there is no cognizable irreparable injury that they would suffer. So plaintiffs did not address that at all. They did not dispute our demonstration. In fact, in their response brief, they don't even claim that it's impossible that they would be restored to the position they were in before they were discharged. They say that it's our position that they couldn't be restored. And that's simply not true for the reasons that we provide in our response brief. So you will have stipulated that? Your Honor, we're stipulating to exactly what we say in our reply brief, which is they will be placed in exactly the position that they were in before they were discharged. They are the explanation is a bit more complicated because their terms of enlistment have expired, but they would be treated like any individual whose term of enlistment had not expired and had or sorry, had expired but had not been discharged. Their HIV status would not be a consideration in their reenlistment if this if they ultimately prevail on the merits. The second point I'd like to — How does that affect this case? I'm having trouble understanding that. To receive an injunction, one has to — an essential part of the demonstration is irreparable injury. This shows that plaintiffs have not identified any irreparable injury because they would be put back in the place that they were before the discharge occurred, and they would be treated as if they had not been discharged. This is in our response brief in some detail. Would they be deployable? They would not be deployable, but they would — well, it would depend on what the ultimate holding on the merits were. I somewhat doubt — I'm sorry, Your Honor. I can't predict what the courts would ultimately say. I can't predict what the response would be of the military. So those are questions that would have to be asked, and it would depend on what their prevailing is — on what terms they prevailed. Did you make this argument with respect to irreparable injury to the district court? And if so, what did the court find? Your Honor, this precise argument we did not make because the plaintiffs, for the first time in their response brief, said that it is impossible — they said that we said that it is impossible for them to be restored in the place they were. They purport to describe our position as saying that the courts have no authority to enlist an individual. And while that's true, it's only part of the story because, for example, if an individual commits a crime between the term of the expiration of their enlistment and a reconsideration, that would be a basis for not reenlisting them. But our position is, as detailed in the response brief, that if they prevail on the merits, they would be in exactly the same condition that they were in before they were discharged, and their HIV status would not be a factor in considering their reenlistment. If I might get to the other two points I'd like to make, counsel pointed to evidence in the record, and he suggested that this shows that HIV is not transmittable, that there's virtually no risk in the combat area. This is, with respect to counsel, a mischaracterization of the evidence. Individuals who acquired HIV during deployment are different than those who are sent over, who are deployed. Individuals who are diagnosed with HIV are immediately evacuated. They have untreated HIV, and they're evacuated back so that they can receive treatment. These are not individuals who are in the field, who are subject to combat situations where there could be wound-to-wound contact and the other considerations that I had discussed before. In addition, because the military does not deploy HIV-positive personnel to CENTCOM, there is not a basis for making this evaluation. Second ---- You're saying individuals who are already deployed and you have HIV detected, they are evacuated? They acquire it during their deployment. That stands to reason they're not at the level where it's undetectable. And they are immediately evacuated, Your Honor. Those who are at the undetectable level, why would you treat them the same as those who are undetectable? Your Honor, with respect, that's apples and oranges for the following reason. You brought it up. No, I understand, Your Honor. The comparison Your Honor is asking about, I'd like to suggest, are apples and oranges. When a person is diagnosed on deployment, he or she is immediately evacuated. A person ex-ante who is already diagnosed with HIV, there is a decision made whether or not the risks of deployment outweigh the benefit to the military. And for all the reasons we've presented, the CENTCOM reasonably determined had a rational basis for saying that they don't. If I might, counsel pointed on the APA side of things to Air Force 44-178 and claimed that ---- Thank you, Your Honor. Thank you, Your Honor. 2.4.2, counsel described as saying that ---- suggests that the Air Force does not permit discharge on stereopositivity alone, but then says that discharge ---- sorry, that deployment is categorically barred. That's not correct. That's not what the regulation says. If the Court looks to Joint Appendix 351, 2.4.2 recognizes that deployment is possible with a waiver. And as I said ---- We will let you end with that. Actually, if you don't mind, I do have a question. So as Mr. Eaton sort of differentiated these claims, he suggested, well, we have two separate claims. One is a deployability claim. We think we prevail on that. But even if we don't prevail on that, the Air Force instruction that you just read indicates that you have stereopositivity. So what about that? That's correct, Your Honor, and the Air Force does not. Let me give an analogy, if I might. A pilot who acquires incurable air sickness and can no longer fly, if that pilot is discharged, the pilot is not discharged simply because the pilot has air sickness. It's the air sickness in combination with the inability to perform the duty, that is, the ability to fly a plane. So here, the inability to deploy? Exactly, Your Honor. The inability to deploy based on CENTCOM policies that are rationally based. That's exactly right, Your Honor. All right. Thank you. Thank you, Your Honors. All right. We'll come down and recounsel and move to our second case.
judges: James A. Wynn Jr., Albert Diaz, Henry F. Floyd